# Matter of Agustin ORTEGA-LOPEZ, Respondent

*Decided August 6, 2018*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) The offense of sponsoring or exhibiting an animal in an animal fighting venture in violation of 7 U.S.C. § 2156(a)(1) (2006) is categorically a crime involving moral turpitude. *Matter of Ortega-Lopez*, 26 I&N Dec. 99 (BIA 2013), reaffirmed.

(2) An alien is ineligible for cancellation of removal under section 240A(b)(1)(C) of the Immigration and Nationality Act, 8 U.S.C. § 1229b(b)(1)(C) (2012), for having "been convicted of an offense under" section 237(a)(2)(A)(i) of the Act, 8 U.S.C. § 1227(a)(2)(A)(i) (2012), irrespective of both the general "admission" requirement in section 237(a) and the temporal (within 5 years of admission) requirement in section 237(a)(2)(A)(i)(I). *Matter of Cortez*, 25 I&N Dec. 301 (BIA 2010), reaffirmed.

FOR RESPONDENT: N. David Shamloo, Esquire, Portland, Oregon

FOR THE DEPARTMENT OF HOMELAND SECURITY: David A. Landau, Senior Litigation Coordinator

BEFORE: Board Panel: MALPHRUS, MULLANE, and LIEBOWITZ, Board Members.

MALPHRUS, Board Member:

In a decision dated February 14, 2011, an Immigration Judge found the respondent removable on his own admissions under section 212(a)(6)(A)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(A)(i) (2006), as an alien who is present in the United States without being admitted or paroled, and denied his application for cancellation of removal under section 240A(b)(1) of the Act, 8 U.S.C. § 1229b(b)(1) (2006). We dismissed the respondent's appeal in *Matter of Ortega-Lopez*, 26 I&N Dec. 99 (BIA 2013), holding that his conviction for sponsoring or exhibiting an animal in an animal fighting venture in violation of 7 U.S.C. § 2156(a)(1) (2006)[1] is categorically for a crime involving moral turpitude, which is an "offense

---

[1]  At the time of the respondent's offense in March 2007, 7 U.S.C. § 2156(a)(1) provided that it is "unlawful for any person to knowingly sponsor or exhibit an animal in an animal fighting venture, if any animal in the venture was moved in interstate or foreign commerce." "[T]he term 'animal fighting venture' means any event which involves a fight between at least two animals and is conducted for purposes of sport, wagering, or entertainment." 7 U.S.C. § 2156(g)(1).

under" section 237(a)(2)(A)(i) of the Act, 8 U.S.C. § 1227(a)(2)(A)(i) (2006), that renders him ineligible for relief under section 240A(b)(1)(C).[2]

The case is now before us on remand from the United States Court of Appeals for the Ninth Circuit for further consideration of the question whether animal fighting in violation of 7 U.S.C. § 2156(a)(1) is a crime involving moral turpitude. We received supplemental briefing on this issue.[3] *Ortega-Lopez v. Lynch*, 834 F.3d 1015 (9th Cir. 2016). We have also received supplemental briefing addressing the proper interpretation of section 240A(b)(1)(C) of the Act in light of the Ninth Circuit's intervening decision in *Lozano-Arredondo v. Sessions*, 866 F.3d 1082 (9th Cir. 2017). The respondent's appeal will again be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

We incorporate by reference the factual and procedural history set forth in *Matter of Ortega-Lopez*, 26 I&N Dec. at 99–100, but will also summarize relevant parts of our decision. The respondent is a native and citizen of Mexico who was convicted in 2009 of violating 7 U.S.C. § 2156(a)(1), for which he was sentenced to a year of probation. At the time the offense was committed, it carried a potential sentence to a term of imprisonment for not more than 1 year under 7 U.S.C. § 2156(e) (2006).[4] In our prior decision, we affirmed the Immigration Judge's ruling that the conduct proscribed by § 2156(a)(1) categorically involves moral turpitude.

On remand, the Ninth Circuit has asked us to further consider whether sponsoring or exhibiting an animal in an animal fighting venture involves moral turpitude in light of its statement in *Nunez v. Holder*, 594 F.3d 1124, 1131 (9th Cir. 2010), that "non-fraudulent crimes of moral turpitude almost always involve an intent to harm someone, the actual infliction of harm upon someone, or an action that affects a protected class of victim." *See Ortega-Lopez*, 834 F.3d at 1018. The court also stated that the portion of § 2156(a)(1) pertaining to "harm to chickens is, at first blush, outside the normal realm" of a crime involving moral turpitude. *Id.* While we respect the considerations raised on remand, our further review of this issue leads us

---

[2]  Section 240A(b)(1)(C) of the Act provides that cancellation of removal under section 240A(b)(1) is not available to an alien who has "been convicted of an *offense under* section 212(a)(2), 237(a)(2), or 237(a)(3)" of the Act. (Emphasis added.)

[3]  We acknowledge and appreciate the thoughtful arguments submitted by the parties and amici curiae in response to our supplemental briefing requests.

[4]  On May 3, 2007, the penalty provision was enhanced and moved to a different section at 18 U.S.C. § 49 (Supp. I 2007). *See* Animal Fighting Prohibition Enforcement Act of 2007, Pub. L. No. 110-22, § 3(5), 121 Stat. 88, 89.

to the same result.  We will therefore clarify our rationale for concluding that moral turpitude necessarily inheres in all violations of this statute.

Because of the Ninth Circuit's intervening decision in *Lozano-Arredondo*, we must also address whether the respondent is barred from relief by section 240A(b)(1)(C) of the Act as an alien convicted of an "offense under" section 237(a)(2) of the Act—specifically, section 237(a)(2)(A)(i).[5]  In that decision, the court disagreed with our conclusion in *Matter of Cortez*, 25 I&N Dec. 301, 307–08 (BIA 2010), that the plain language of section 240A(b)(1)(C) provides that only the offense-specific characteristics contained in the cross-referenced sections of the Act (that is, the listed generic offense and any corresponding sentencing requirement) are applicable in determining whether an applicant has been convicted of an "offense under" one of those sections.  The Ninth Circuit found the statutory language to be ambiguous and held that, because *Matter of Cortez* was based on the perceived unambiguous language of the statute, we did not consider any other possible interpretations.  Accordingly, the court has asked us "to exercise [our] expertise and discretion" in interpreting the ambiguity.  *Lozano-Arredondo*, 866 F.3d at 1089.  We will reaffirm our decision in *Matter of Cortez* and further explain why we view that interpretation as the most reasonable reading of the statute.

## II.  ANALYSIS

### A.  Crime Involving Moral Turpitude

To determine whether a conviction is for a crime involving moral turpitude, we employ the "categorical approach" by "comparing the elements of the . . . offense to those of the generic [definition of a crime involving moral turpitude] to determine if there is a categorical match."  *Escobar v. Lynch*, 846 F.3d 1019, 1024 (9th Cir. 2017) (citations omitted).  "This [approach] requires us to focus on the minimum conduct that has a realistic probability of being prosecuted under the statute of conviction, rather than on the facts underlying the respondent's particular violation of that statute."

---

[5]  The respondent's conviction is not for an "offense under" section 212(a)(2)(A)(i)(I) of the Act because his crime qualifies for the petty offense exception in section 212(a)(2)(A)(ii)(II).  *See Matter of Garcia-Hernandez*, 23 I&N Dec. 590, 593 (BIA 2003) (holding that a conviction for a crime involving moral turpitude that qualifies as a petty offense is not for an "offense under" section 212(a)(2)(A)(i)(I)).  However, pursuant to *Matter of Cortez*, 25 I&N Dec. 301 (BIA 2010), the respondent is nevertheless ineligible for relief under section 240A(b)(1)(C) of the Act as an alien convicted of an "offense under" section 237(a)(2)(A)(i).

*Matter of Silva-Trevino*, 26 I&N Dec. 826, 831 (BIA 2016); *see also Escobar*, 846 F.3d at 1024.

To constitute a crime involving moral turpitude, an offense must have two essential elements: a culpable mental state and reprehensible conduct. *Matter of Jimenez-Cedillo*, 27 I&N Dec. 1, 3 (BIA 2017), *remanded on other grounds*, 885 F.3d 292, 300 (4th Cir. 2018); *see also Matter of Louissaint*, 24 I&N Dec. 754, 756–57 (BIA 2009) ("[A] crime involving moral turpitude involves reprehensible conduct committed with some degree of scienter, either specific intent, deliberateness, willfulness, or recklessness." (citation omitted)). Conduct is "reprehensible" if it is "inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Matter of Jimenez-Cedillo*, 27 I&N Dec. at 3 (citation omitted). This determination regarding the nature of a crime is governed by "contemporary moral standards and may be susceptible to change based on the prevailing views in society." *Matter of Lopez-Meza*, 22 I&N Dec. 1188, 1192 (BIA 1999).

The Ninth Circuit has deferred to the manner in which we apply this definition through case-by-case adjudications in order to "assess[] the character, gravity, and moral significance of the conduct" in question. *Marmolejo-Campos v. Holder*, 558 F.3d 903, 910 (9th Cir. 2009) (en banc). As the court explained, this approach allows the Board to "draw[] upon its expertise as the single body charged with adjudicating all federal immigration cases" and "is precisely the type of agency action the Supreme Court instructs is entitled to . . . deference." *Id.*; *see also Mendoza v. Holder*, 623 F.3d 1299, 1303 (9th Cir. 2010).

At the same time, the Ninth Circuit's deference to our interpretation and application of the various "crime involving moral turpitude" provisions of the Act has not been universal in decisions issued after *Marmolejo-Campos*. A number of recent decisions employ the court's "own . . . definition of moral turpitude." *Rivera v. Lynch*, 816 F.3d 1064, 1070 (9th Cir. 2016) (citations omitted); *see also, e.g.*, *Castrijon-Garcia v. Holder*, 704 F.3d 1205, 1212 n.7 (9th Cir. 2013). Under its definition, the Ninth Circuit recognizes that crimes involving moral turpitude "fall into two categories: '[1] those involving fraud and [2] those involving grave acts of baseness or depravity.'" *Ortega-Lopez*, 834 F.3d at 1018 (alterations in original) (quoting *Robles-Urrea v. Holder*, 678 F.3d 702, 708 (9th Cir. 2012)). The Ninth Circuit has further explained that offenses that do not involve fraud and therefore fall into the second category "almost always" involve an intent to injure, an injury to a person, or an act affecting a protected class of victims. *Id.* (quoting *Nunez*, 594 F.3d at 1131). The Ninth Circuit remanded for us to consider whether a violation of § 2156(a)(1), an offense that does not involve fraud, involves one of these three circumstances.

While we recognize that these principles may serve as useful guideposts, we have never considered our determination whether a crime involves moral turpitude to be strictly limited to the foregoing categories. As the Ninth Circuit has acknowledged, these categories are "not exhaustive." *Rivera*, 816 F.3d at 1074; *see also Nunez*, 594 F.3d at 1131 & n.4. In other words, offenses that fall into these categories are crimes involving moral turpitude, but the definition of moral turpitude is broader. Indeed, the Ninth Circuit has found that some offenses that do not involve fraud are crimes involving moral turpitude even in the absence of an intent to injure, an injury to persons, or a protected class of victims. *See, e.g.*, *Rohit v. Holder*, 670 F.3d 1085, 1088–91 (9th Cir. 2012) (holding that the violation of a prostitution statute that covered consensual sex acts by adults was a crime involving moral turpitude); *Gonzalez-Alvarado v. INS*, 39 F.3d 245, 246–47 (9th Cir. 1994) (per curiam) (concluding that the offense of incest under a statute that covered consensual sex acts by adults of a certain degree of consanguinity was a crime involving moral turpitude).

If our understanding in this regard is incorrect, we would respectfully disagree with the Ninth Circuit's approach. As we explained in *Matter of Cortes Medina*, 26 I&N Dec. 79, 82 (BIA 2013), the phrase "crime involving moral turpitude" is not amenable to a clear-cut comprehensive definition that identifies certain offenses to the exclusion of all others. Such an approach "is unrealistic given the nature of this broad legal term and the myriad Federal and State statutes potentially at issue." *Id.*; *see also Matter of Ortega-Lopez*, 26 I&N Dec. at 100 n.2. To hold otherwise would eviscerate our ability to "assess[] the character, gravity, and moral significance of the conduct" on a case-by-case basis and "draw[] upon [our] expertise," *Marmolejo-Campos*, 558 F.3d at 910, to decide whether the specific offense at issue is "inherently base, vile, or depraved, and contrary to the accepted rules of morality and the duties owed between persons or to society in general." *Matter of Silva-Trevino*, 26 I&N Dec. at 833 (citations omitted).

In our view, conduct such as prostitution and incest is so contrary to the standards of a civilized society as to be morally reprehensible. *See Rohit*, 670 F.3d at 1088–91; *Gonzalez-Alvarado*, 39 F.3d at 246–47. The minimum conduct covered by such crimes generally relates to sexual acts committed by consenting adults. We recognize these crimes as morally reprehensible, not on account of the presence of harm or the need to protect a vulnerable segment of society, but because of the socially degrading nature of commercialized sexual services and incestuous sexual relations. These crimes "offend[] the most fundamental values of society." *Rivera*, 816 F.3d at 1075 (alteration in original) (quoting *Robles-Urrea*, 678 F.3d at 705). We consider the crime of sponsoring or exhibiting an animal in an animal fighting venture to be of a similar nature.

For these reasons, we conclude that in assessing whether an offense that does not involve fraud is a crime involving moral turpitude, the absence of an intent to injure, an injury to persons, or a protected class of victims is not determinative. We find it appropriate to apply this rule nationwide, including in the Ninth Circuit, because a single rule furthers the paramount need for "uniformity in the administration of immigration laws." *Cazarez-Gutierrez v. Ashcroft*, 382 F.3d 905, 912 (9th Cir. 2004); *see also Matter of D-R-*, 27 I&N Dec. 105, 108 (BIA 2017) ("The agency's interpretation of a statute applies, regardless of the circuit court's contrary precedent, unless 'the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.'" (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005))).

We now turn to the question whether the respondent's offense is a crime involving moral turpitude. Under 7 U.S.C. § 2156(a)(1), it is "unlawful for any person to *knowingly* sponsor or exhibit an animal in an animal fighting venture." (Emphasis added.) This offense indisputably involves intentional conduct. The issue before us then is whether the conduct proscribed by the statute is reprehensible. *See Matter of Leal*, 26 I&N Dec. 20, 24–25 (BIA 2012); *Matter of Ruiz-Lopez*, 25 I&N Dec. 551, 551 (BIA 2011) ("Where knowing or intentional conduct is an element of a morally reprehensible offense, we have found moral turpitude to be present.").

We respectfully reaffirm our conclusion that knowingly sponsoring or exhibiting an animal in an animal fighting venture is a crime involving moral turpitude. In this decision, we clarify our view that, because the conduct encompassed in a violation of § 2156(a)(1) celebrates animal suffering for one's personal enjoyment, it transgresses the socially accepted rules of morality and breaches the duty owed to society in general. *See United States v. Stevens*, 559 U.S. 460, 477 (2010) (noting that "cockfighting [has] long [been] considered immoral in much of America").

As we explained in our prior decision, "animal fighting . . . is a spectacle of animal suffering engaged in purely for entertainment, the entire purpose of which is the intentional infliction of harm or pain on sentient beings that are compelled to fight, often to the death." *Matter of Ortega-Lopez*, 26 I&N Dec. at 101 (citation omitted) (internal quotation mark omitted). We also generally described the brutal and vicious nature of dogfighting and cockfighting, which leads to painful injuries and the extreme suffering and often death of the animals, all of which is brought upon for the personal enjoyment of those involved. *Id.*; *see also Animal Fighting Prohibition Enforcement Act of 2005: Hearing on H.R. 817 Before the Subcomm. on Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*,

109th Cong. 56, 57 (2006) (statement of W. Ripley Forbes, Dir. of Gov't Affairs, Am. Humane Soc'y) [hereinafter *Hearing on H.R. 817*].

It is the exhibition and celebration of suffering in animal fighting events that runs contrary to basic standards of decency and humanity. Such acts of senseless brutality, which demonstrate a reprehensible desire to relish in the infliction of pain, have long been recognized as degrading, not only to the participants personally, but to all of society. *See Commonwealth v. Tilton*, 49 Mass. (8 Met.) 232, 234–35 (1844) (describing animal fighting as "barbarous and cruel, leading to disorder and danger, and tending to deaden the feelings of humanity, both in those who participate in it, and those who witness it"). It desensitizes spectators to brutality and violence and teaches "that inflicting pain is an acceptable form of amusement." *Hearing on H.R. 817*, *supra*, at 57 (discussing significant concerns regarding developing children who attend these events); *see also Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 68 n.15 (1973) (stating that animal fighting events have been outlawed because they "debased and brutalized the citizenry who flocked to witness such spectacles" (citation omitted) (internal quotation mark omitted)). This view is consistent with the legislative history supporting the enactment of § 2156 in 1976. *See* H.R. Rep. No. 94-801, at 10 (1976) (noting that animal fighting is "dehumanizing, abhorrent, and utterly without redeeming social value").

The fact that the prohibition of animal fighting under § 2156(a)(1) is not limited to fights with domesticated animals and that the statute covers chickens, which are the type of animals involved in cockfighting, does not alter our conclusion.[6] Cockfighting is not a benign activity. It involves attaching a knife or "ice-pick like devices called gaffes . . . to all of the birds' legs to enhance the bloodletting, gouged eyes, punctured lungs, all sorts of grievous wounds" for the entertainment of the people involved in the events. *Hearing on H.R. 817*, *supra*, at 5 (testimony of Wayne Pacelle, President and CEO, Humane Soc'y of the U.S.). The immorality that exists in a violation of § 2156(a)(1) results from the interrelationship of the suffering that is

---

[6]   We agree with the amici that argue that animal fighting ventures involving domesticated animals are especially abhorrent because of the unique relationship humans share with such animals. However, moral turpitude inheres in knowingly celebrating the suffering of any animal forced to participate in the type of activity covered in 7 U.S.C. § 2156(g)(5). *See Matter of Ortega-Lopez*, 26 I&N Dec. at 104 n.4 ("[O]ur determination that a violation of 7 U.S.C. § 2156(a)(1) is categorically a crime involving moral turpitude is not dependent on the type of animal involved."). Another common form of animal fighting not discussed in our prior decision is hog-dog fights where "boars' tusks are cut off and they are placed in a pen" with pit bulls, often resulting "in the ears of the boar being torn off or their jowls being ripped open." *Hearing on H.R. 817*, *supra*, at 11 (statement of Wayne Pacelle, President and CEO, Humane Soc'y of the U.S.).

experienced by the animals with the celebration in that suffering by those involved in the animal fighting ventures.[7]

We also recognize that animals serve utilitarian purposes, such as for hunting and food production. To this end, there may be certain practices that are inevitably harmful to animals that are regarded by society as necessary or acceptable to accomplish the underlying utilitarian objective. *See generally* Gary L. Francione*, Animals, Property and Legal Welfarism: "Unnecessary" Suffering and the "Humane" Treatment of Animals*, 46 Rutgers L. Rev. 721, 739–40 (1994). However, we are not persuaded that such tolerance undercuts or otherwise reduces the inhumanity in participating in a venture whose purpose is to objectify the suffering of animals for personal pleasure. *See Animal Fighting Prohibition Enforcement Act of 2007: Hearing on H.R. 137 Before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary*, 110th Cong. 46 (2007) (testimony of Wayne Pacelle) ("[T]here are lots of controversial and tough moral questions about how we treat animals in society, but staged animal fights where people are putting animals in a pit to fight to injury or death just for the amusement . . . is not a tough moral question."). Moreover, the conduct proscribed by § 2156(a)(1) specifically excludes from its coverage ventures "the primary purpose of which involves the use of one or more animals in hunting another animal." 7 U.S.C. § 2156(g)(1).

With respect to the contentions of the respondent and amicus regarding the breadth of § 2156(a)(1), we are not persuaded that one could "sponsor or exhibit an animal" in an animal fighting venture by merely paying a fee to attend an animal fight or being a vendor at such an event. The statute plainly speaks to the sponsorship of a specific animal, which does not encompass financial contributions, directly or indirectly, to the event itself. *See United States v. Kingrea*, 573 F.3d 186, 192 (4th Cir. 2009) ("[T]he act that Congress has determined to be an unlawful act [under § 2156(a)(1)] is the sponsoring of 'an animal in' an animal fighting venture, not simply sponsoring a fighting venture.").[8] Furthermore, subsequent to the

---

[7] The parties and amici do not meaningfully dispute that all the animals covered by the definition of an "animal" in § 2156(g)(5) are sentient creatures capable of experiencing pain and suffering. *See generally* Gary L. Francione, *Equal Consideration and the Interest of Nonhuman Animals in Continued Existence: A Response to Professor Sunstein*, 2006 U. Chi. Legal F. 231, 234 (2006) ("[T]here is no serious doubt that . . . cows, pigs, [and] chickens . . . are capable of experiencing pain and suffering.").

[8] The cases that the respondent and amicus rely on in this regard are not persuasive. Some appear to be detailing convictions under 18 U.S.C. § 2 (2012) for aiding and abetting a violation of 7 U.S.C. § 2156(a)(1), whereas the respondent was convicted of the substantive offense under § 2156(a)(1). *See, e.g.*, *United States v. Olney*, No. 1:13-CR-2094-TOR-19, 2016 WL 660886, at *1–2 (E.D. Wash. Feb. 18, 2016) (discussing the difference between

respondent's conviction, Congress amended the statute to proscribe, as a separate offense, attending an animal fighting venture. *See* Agricultural Act of 2014, Pub. L. No. 113-79, § 12308(b)(1), 128 Stat. 649, 990–91 (codified at 7 U.S.C. § 2156(a)(2) (Supp. II 2014)).[9] We need not decide here whether that conduct amounts to a crime involving moral turpitude.

Finally, we recognize, as the respondent and some amici emphasize, that cockfighting is not criminalized in all jurisdictions throughout the United States. *See Ortega-Lopez*, 834 F.3d at 1017 n.1 ("Unlike dogfighting, which is illegal everywhere in the United States, cockfighting remains legal in Guam, the Northern Mariana Islands, Puerto Rico, and the U.S. Virgin Islands."). However, the fact that several territories of the United States have not updated their laws to ban some forms of animal fighting does not change our conclusion regarding the profoundly degrading nature of such conduct. The clear consensus in contemporary American society, as embodied by the laws of all 50 States and the District of Columbia and Federal law, is that sponsoring or exhibiting the spectacle of animal suffering is morally reprehensible. Our duty is to determine whether this offense under Federal law is a crime of moral turpitude under the immigration laws.

Moreover, there are offenses, like prostitution, that are widely viewed as morally turpitudinous but that are not criminalized in every jurisdiction of every State. *See Erotic Serv. Provider Legal Educ. & Research Project v. Gascon*, 880 F.3d 450, 460 & n.2 (9th Cir.), *amended*, 881 F.3d 792 (9th Cir. 2018). *See generally* Memorandum from Att'y Gen. Eric H. Holder, Jr., to All Department Personnel, (Apr. 10, 2015), https://www.justice.gov /file/1047646/download ("Regardless of whether prostitution is legal or tolerated in a particular jurisdiction, soliciting prostitutes creates a greater demand for human trafficking victims and a consequent increase in the number of minor and adult persons trafficked into commercial sex slavery."). Prostitution is unquestionably a crime involving moral turpitude under the immigration laws. *See Rohit*, 670 F.3d at 1090–91; *Matter of W-*, 4 I&N Dec.

---

the elements of the substantive offense under § 2156(a)(1) and aiding and abetting such an offense under 18 U.S.C. § 2, and finding that a defendant who "did not . . . personally exhibit[] or sponsor[] any particular rooster he owned in the animal fighting venture," was only guilty of aiding and abetting for his conduct in hosting the venture, inviting participants and spectators, and acting as a vendor), *aff'd*, 693 F. App'x 652 (9th Cir. 2017); *United States v. Lawson*, 677 F.3d 629, 635 (4th Cir. 2012). Likewise, the discussion in *United States v. Salud-Garcia*, No. 8-34-HA, 2008 WL 4858264, at *1 (D. Or. Nov. 10, 2008), is limited to the charge of conspiracy and does not reflect whether a conviction was obtained for the substantive offense under § 2156(a)(1). Finally, the decision in *State v. Albee*, 847 P.2d 858, 859 (Or. Ct. App. 1993), pertains to a conviction under State law, not § 2156(a)(1).

9  Congress' criminalization of the mere act of attending animal fighting ventures further reflects society's rejection of this activity.

401, 402 (C.O. 1951); *accord Reyes v. Lynch*, 835 F.3d 556, 560 (6th Cir. 2016); *Gomez-Gutierrez v. Lynch*, 811 F.3d 1053, 1058–59 (8th Cir. 2016). Relatedly, the fact that comparably similar evils are not covered under § 2156(a)(1) is not significant to our consideration of this issue.

In sum, sponsoring or exhibiting an animal in an animal fighting venture is contrary to the most basic moral standards that exist in our civilized society. This activity, which serves no utilitarian purpose, leads to the extreme suffering or death of the animals that are forced to fight for the base entertainment and enjoyment of the people involved. We therefore conclude that the respondent's participation in an animal fighting venture as proscribed by 7 U.S.C. § 2156(a)(1) is categorically a crime involving moral turpitude.

### B. "Offense Under" Section 237(a)(2) of the Act

An applicant for cancellation of removal under section 240A(b)(1) of the Act must demonstrate that he has not been "convicted of an offense under section 212(a)(2), 237(a)(2), or 237(a)(3)." Section 240A(b)(1)(C) of the Act; *see also* 8 C.F.R. § 1240.8(d) (2018). The question we must answer is whether the reference to an "offense under" the cross-referenced sections incorporates all or part of those sections, or if Congress intended some other interpretation of the statute. According to the Ninth Circuit, the statutory text is ambiguous on this point. *See Lozano-Arredondo*, 866 F.3d at 1090.

This issue arises from the fact that the deportability grounds contained in sections 237(a)(2) and (3) of the Act are generally not applicable to applicants who, like the respondent, entered the United States without inspection and have not thereafter been subjected to an act that would constitute an "admission." *See Shivaraman v. Ashcroft*, 360 F.3d 1142, 1144 (9th Cir. 2004) (stating that where an alien "enter[s] the country unlawfully, *without* inspection and authorization by an immigration officer . . . , [that] entry d[oes] not constitute an 'admission'"); *see also, e.g.*, *Ocampo-Duran v. Ashcroft*, 254 F.3d 1133, 1134–35 (9th Cir. 2001); *Matter of Rosas*, 22 I&N Dec. 616, 617–24 (BIA 1999). By their plain terms, sections 237(a)(2) and (3) only apply to aliens who have been "admitted to the United States." Section 237(a) of the Act. Moreover, a number of deportability grounds contain a temporal requirement tied to the time of an alien's "admission." *See* sections 237(a)(2)(A)(i)–(iii), (B), (C), (E)(i)–(ii) of the Act. As relevant here, section 237(a)(2)(A)(i)(I) contains a temporal requirement, which provides that the conduct giving rise to the underlying conviction must "be committed within five years . . . after the date of admission."

It is well settled that "all offenses described in [sections 212(a)(2), 237(a)(2), and 237(a)(3)] apply to all aliens—regardless of admission

status—for purposes of [section 240A(b)(1)(C)'s] bar on cancellation of removal." *Lozano-Arredondo*, 866 F.3d at 1090 (citing *Gonzalez-Gonzalez v. Ashcroft*, 390 F.3d 649, 652 (9th Cir. 2004)); *accord Matter of Almanza*, 24 I&N Dec. 771, 776 (BIA 2009), *overruled on other grounds*, 815 F.3d 469, 482 (9th Cir. 2016) (en banc). The issue now in dispute is what aspects of section 237(a)(2) of the Act are retained by virtue of the "offense under" language contained in section 240A(b)(1)(C).

We have interpreted section 240A(b)(1)(C)'s use of the phrase "offense under" as only incorporating the offense-specific characteristics contained in the cross-referenced sections—that is, the listed generic offense and any corresponding sentencing requirements. *Matter of Cortez*, 25 I&N Dec. at 307; *see also Matter of Pedroza*, 25 I&N Dec. 312, 314–16 (BIA 2010). As relevant here, section 237(a)(2)(A)(i) of the Act sets forth a generic offense—a crime involving moral turpitude—and a sentencing requirement—the offense must be one "for which a sentence of one year or longer may be imposed." We have therefore concluded that neither the general "admission" requirement under section 237(a) nor the temporal requirement in section 237(a)(2)(A)(i)(I) of the Act (that the offense be "committed within five years . . . after the date of admission") is part of the "offense" under that section. *Matter of Cortez*, 25 I&N Dec. at 307–10. Every other circuit that has addressed this issue has deferred to our interpretation. *See Andrade-Zamora v. Lynch*, 814 F.3d 945, 951–52 (8th Cir. 2016) (collecting cases); *accord Lucio-Rayos v. Sessions*, 875 F.3d 573, 584 (10th Cir. 2017), *petition for cert. filed*, (U.S. July 12, 2018) (No. 18-64).

The Ninth Circuit has instructed us to consider whether a more reasonable interpretation is that section 240A(b)(1)(C) of the Act incorporates the entirety of the cross-referenced sections and, at the same time, alters the meaning of "admission," as that term is used throughout section 237(a) of the Act. *Lozano-Arredondo*, 866 F.3d at 1092–93. In particular, the court suggested that it might be possible to construe the term "admission" to mean physical "entry" in this context. *Id.* at 1092. Under such an interpretation, the temporal "admission" requirements in the deportation provisions of section 237(a)(2) would remain relevant in defining what constitutes an "offense under" these sections for purposes of the section 240A(b)(1)(C) bar. Thus, the Ninth Circuit found it plausible to read section 240A(b)(1)(C) as incorporating all of section 237(a)(2)(A)(i) of the Act, yet modifying the "within five years" provision as counting from the applicant's date of "entry" instead of "admission." The respondent also argues in favor of this approach.

We respectfully disagree with this interpretation for two reasons. First, one of the overarching themes of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Division C of Pub. L. No. 104-208, 110 Stat. 3009-546 ("IIRIRA"), was to replace the term "entry" with the term

"admission," thereby providing that a person who had entered the United States without meeting the specific statutory requirements for an admission would be subject to grounds of inadmissibility, rather than deportability. *See* IIRIRA § 301, 110 Stat. at 3009-575 (titled "Treating persons present in the United States without authorization as not admitted"). Construing the word "admission" to mean "entry" would be contrary to that overall purpose. In addition, Congress demonstrated that it considered the terms to have different meanings because it retained the term "entry" in certain provisions. *See, e.g.*, section 237(a)(1)(E) of the Act.

Furthermore, interpreting the cross-reference to an "offense under" section 237(a)(2) as *modifying* the meaning of "admission" throughout section 237(a)(2) is, in our view, outside the scope of any ambiguity that exists in section 240A(b)(1)(C) of the Act. *See Lozano-Arredondo*, 866 F.3d at 1090 (finding the statute ambiguous because it "does not say whether it incorporates the entire deportable offense or only part of it"); *see also, e.g.*, *Bower v. Fed. Express Corp.*, 96 F.3d 200, 208 (6th Cir. 1996) ("Ambiguity anywhere in a statute is not a license . . . to roam about that statute looking for other provisions to narrow or expand through the process of definition.").

The function of a cross-reference is to incorporate, in whole or in part, the requirements of the referenced section. *See Calix v. Lynch*, 784 F.3d 1000, 1010 (5th Cir. 2015) ("Logically, there are three categories of potential incorporation of immigration-related provisions— . . . all, some, or none."); *see also Gonzalez-Gonzalez*, 390 F.3d at 652 ("The plain language [of section 240A(b)(1)(C)] indicates that it should be read [as a] cross-reference . . . ."). There is a significant difference between incorporation and *modification*. *See, e.g.*, *Torres v. Lynch*, 136 S. Ct. 1619, 1626 n.5 (2016) (recognizing the general premise that where a statute refers to another statute, the "description cannot refer to features that the thing being described does not have" (citation omitted)).

Consistent with our decision in *Matter of Cortez*, it is our continued view that the most reasonable reading of section 240A(b)(1)(C) is that it cross-references a selected segment—the "offense"—of a collective whole—the corresponding ground of removability under section 212(a)(2), 237(a)(2), or 237(a)(3). Read this way, the meaning of the cross-referenced sections remains constant, with only the "offense" characteristics contained in each being operative. Faced with interpreting an ambiguous statute in a manner that is consistent with its statutory cross-reference or reconstruing a cross-referenced statute for the purpose of resolving an ambiguity in the referencing provision, we believe the former is the better approach.

We cannot agree with the suggestion in *Lozano-Arredondo*, 866 F.3d at 1092, that, unlike the interpretation we adopted in *Matter of Cortez*, giving a "context-specific meaning to 'admission' would give effect to each word in

the statute." There is a considerable difference between an interpretation that causes language to be superfluous and one that reads aspects of a statute as being inapplicable when they have independent meanings in other contexts. *See generally Torres*, 136 S. Ct. 1619 (interpreting a statutory cross-reference as containing some, but not all, of the cross-referenced requirements).

The "admission" and the temporal requirements throughout section 237(a) of the Act are significant in determining an alien's removability, and Congress created these requirements for this purpose. The fact that they are inapplicable in determining an alien's eligibility for relief under section 240A(b)(1)(C) does not render them superfluous. Our interpretation actually avoids rendering language in the cancellation of removal statute superfluous by recognizing the distinction between the Act's general reference to offenses listed in certain provisions and its reference to an alien's actual *removability* under those provisions. *Compare* section 240A(b)(1)(C) of the Act (barring an alien "convicted of *an offense under*," inter alia, section 237(a)(2) from applying for cancellation of removal (emphasis added)), *and* section 240A(d)(1) of the Act (terminating an alien's continuous residence of physical presence, for purposes of cancellation, where an alien "committed an offense *referred to* in section 212(a)(2)" (emphasis added)), *with* section 240A(b)(2)(A)(iv) of the Act (barring an alien who is "*inadmissible*" under section 212(a)(2) or (3), or "*deportable*" under sections 237(a)(2) through (4) from applying for special rule cancellation of removal (emphases added)), *and* section 240A(d)(1) (requiring that an offense "referred to in section 212(a)(2)" must also "render[] the alien *inadmissible* . . . under section 212(a)(2) or *removable* . . . . under section 237(a)(2) or . . . (4)" (emphases added)). *See generally Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013) ("[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme.").

We also are not persuaded that the legislative history of the statute is inconsistent with our interpretation in *Matter of Cortez* or supportive of an alternative interpretation. In its decision, the Ninth Circuit remanded for us to consider the House Conference Report on the IIRIRA, which summarized section 240A(b)(1)(C) of the Act as rendering ineligible any alien "convicted of an offense that would render the alien inadmissible under section 212(a)(2)(A) or deportable under redesignated sections 237(a)(2) or 237(a)(3)." H.R. Rep. No. 104–828, at 213 (1996) (Conf. Rep.) (Joint Explanatory Statement), 1996 WL 563320. The court concluded that this language "evidences Congress' intent to incorporate the within-five-years element" of section 237(a)(2)(A)(i)(I). *Lozano-Arredondo*, 866 F.3d at 1092.

Respectfully, we cannot agree with this reading of the language of the conference report. On its face, the conference report appears to require that the alien be "deportable." An alien cannot be "deportable" without first satisfying the threshold requirement of being an alien "in and admitted" to the United States. Section 237(a) of the Act. However, there is no dispute that this is *not* what Congress intended in the context of section 240A(b)(1)(C). *See Lozano-Arredondo*, 866 F.3d at 1092 ("Congress expected [section 237(a)(2)] would apply to non-admitted aliens in the cancellation context, even though its text says it applies only to aliens 'in and admitted to the United States.'"). We do not find it reasonable to infer that the conference report signals Congress' intent to require that an alien be "deportable" for purposes of relief, yet not "deportable" in the sense that the term is normally understood. *See Reyes v. Holder*, 714 F.3d 731, 736 (2d Cir. 2013) (per curiam) (stating that where Congress elects to use "the legal terms 'inadmissible' and 'deportable,'" the only rational conclusion is "that an applicant's admission status (*i.e.*, admitted or not admitted) is critical"). As with the statutory language, we find nothing in the referenced legislative history that supports reconstruing the term "admission" in section 237(a)(2) of the Act.

Moreover, the conference report purports to provide that section 240A(b)(1)(C) of the Act only applies to the offenses that are grounds of inadmissibility under section 212(a)(2)(A) of the Act (crimes involving moral turpitude and controlled substance violation). *See* H.R. Rep. No. 104-828, at 213 (stating that section 240A(b)(1)(C) renders ineligible any alien "convicted of an offense that would render the alien inadmissible under *section 212(a)(2)(A)*" (emphasis added)). This language is at odds with the enacted version of section 240A(b)(1)(C), which applies to all criminal grounds under section 212(a)(2). *See Matter of Pina-Galindo*, 26 I&N Dec. 423, 424–25 (BIA 2014) (recognizing that the language from this aspect of the conference report is "imprecise" (quoting *Matter of Bustamante*, 25 I&N Dec. 564, 567 n.1 (BIA 2011))). This leads us to believe that the cited language from the conference report, including its reference to being "deportable," is not a reliable expression of Congress' intent for section 237(a)(2)(A)(i) of the Act.

The statement in the conference report—that the offense must render the alien "inadmissible" or "deportable" under the applicable cross-referenced section—closely tracks the language actually enacted in other provisions of the cancellation statute. *See, e.g.*, sections 240A(b)(2)(A)(iv), (d)(1) of the Act; *see also Matter of Garcia*, 25 I&N Dec. 332, 336 n.3 (BIA 2010) (acknowledging the distinction between the language in sections 240A(b)(1)(C) and (d)(1) of the Act). Had Congress intended to adopt such a requirement in section 240A(b)(1)(C), it certainly could have done so

through the statutory text. *See Jama v. ICE*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *Whitfield v. United States*, 543 U.S. 209, 216–17 (2005) ("Where Congress has chosen *not* to [adopt a requirement in the statutory text], we will not override that choice based on vague and ambiguous signals from legislative history."); *see also Gonzalez-Gonzalez*, 390 F.3d at 653 n.3.

Indeed, when Congress did include such language, it created a result far different from the one we would reach if we adopted the Ninth Circuit's interpretation. For instance, under section 240A(d)(1) of the Act, an alien's continuous physical presence is deemed to end upon the commission of "an offense referred to in section 212(a)(2)," provided that such offense "renders the alien inadmissible . . . under section 212(a)(2) or removable . . . under section 237(a)(2)." There is no dispute that an offense only "renders the alien . . . removable" under section 237(a)(2) if the "in and admitted" and temporal "admission" requirements are satisfied, based on the accepted meaning of "admission" in this context. *See, e.g.*, *Matter of Deanda-Romo*, 23 I&N Dec. 597, 598 n.1 (BIA 2003). We are not persuaded that when Congress used language in the conference report that is nearly identical to the language in section 240A(d)(1), it intended, not to adopt the same meaning of "admission," but instead to create a different scheme that requires extensive statutory reconstruction to be operative. Thus, Congress' exclusion of similar language in section 240A(b)(1)(C) of the Act is much more persuasive than the unclear language in a conference report. *See Shannon v. United States*, 512 U.S. 573, 583 (1994) (finding it improper to give "authoritative weight to a single passage of legislative history that is in no way anchored in the text of the statute").

Our decision in *Matter of Rosas* does not support a blanket departure from the formal definition of the terms "admitted" and "admission" under section 101(a)(13)(A) of the Act, 8 U.S.C. § 1101(a)(13)(A) (2012). In that case, we identified a narrow circumstance in which an adjustment of status would be treated as an "admission," despite its nonconformity with the definition contained in section 101(a)(13)(A) of the Act. *Matter of Rosas*, 22 I&N Dec. at 618–23. Our goal in doing so was to ensure consistency throughout section 237 and "to make the whole Act work coherently and uniformly in all its applications." *Matter of Alyazji*, 25 I&N Dec. 397, 404 (BIA 2011); *accord Ocampo-Duran*, 254 F.3d at 1134–35. If we were to adopt the Ninth Circuit's suggestion in this case, it would undermine uniformity in the application of the term "admission" in section 237(a) and would not be consistent with the plain language of the statute. *See Shivaraman*, 360 F.3d

at 1146 ("Th[e] statutory text leaves no room for doubt, unambiguously defining admission as the *lawful entry* of the alien into the United States." (emphasis added)).[10]

In fact, the proposal in *Lozano-Arredondo*, 866 F.3d at 1092, to give a "context-specific meaning to 'admission'" in section 237(a)(2)(A)(i) of the Act has been rejected as a permissible interpretation of that section. *See Shivaraman*, 360 F.3d at 1147 (declining to adopt a "subjective, malleable construction" to the meaning of the term "admission" in section 237(a)(2)(A)(i)); *accord Matter of Alyazji*, 25 I&N Dec. at 404 (rejecting an invitation "to redefine the term 'admission' on a case-by-case basis, . . . customized to meet each new context"). The Ninth Circuit has similarly rejected the argument "that 'entry' and 'admission' are interchangeable." *Xi v. U.S. INS*, 298 F.3d 832, 838 (9th Cir. 2002). We see no reason to depart from this logic and conflate the clearly distinct principles of "entry" and "admission." In a related context, we have explained that "such an inconsistent understanding of what constitutes an 'admission' would introduce unpredictability and incoherence to the law." *Matter of Alyazji*, 25 I&N Dec. at 404.

In sum, the language and context of section 240A(b) in its entirety leads us to conclude that the best interpretation of section 240A(b)(1)(C) is that the "offense under" language is a limited cross-reference, one that incorporates only the offense-specific characteristics of the cross-referenced sections. *See Pereira v. Sessions*, 138 S. Ct. 2105, 2117 (2018) (recognizing that the word "under" in a statutory cross-reference "is [a] chameleon that 'must draw its meaning from its context'" (quoting *Kucana v. Holder*, 558 U.S. 233, 245 (2010)) (internal quotation mark omitted)). This interpretation is consistent with the two different methods Congress employed to incorporate the criminal provisions of sections 237(a)(2) and (3) in the cancellation statute— by generally referring to offenses listed in certain provisions in the Act and its reference to an alien's actual *removability* under those provisions—only the latter of which requires conformity with the "in and admitted" and temporal "admission" requirements. This interpretation also comports with the well-accepted understanding that, for purposes of section 240A(b)(1)(C), the "offenses described in [sections 212(a)(2), 237(a)(2), and 237(a)(3)] apply to all aliens—regardless of admission status." *Lozano-Arredondo*, 866

---

[10] While the issue before us arises in the context of section 240A(b)(1)(C) of the Act, the term "admission" is only made relevant by virtue of its use in section 237(a). We are unaware of any situation where the term "admission" has been afforded two conflicting interpretations for purposes of the same statute, and reinterpreting section 237(a) is not the appropriate remedy to resolve an ambiguity in another section of the Act. *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each category would be to invent a statute rather than interpret one.").

F.3d at 1090 (citing *Gonzalez-Gonzalez*, 390 F.3d at 652).  Construing the statute so as to reinterpret the term "admission" in section 237(a) to mean "entry" is not supported by the statutory text or context and is not the best reading of the legislative history.

For these reasons, we reaffirm our decision in *Matter of Cortez* and continue to conclude that neither the "in and admitted" requirement of section 237(a) nor the temporal "admission" requirements of the specific deportability grounds are applicable when determining whether section 240A(b)(1)(C) of the Act operates to disqualify an applicant for cancellation of removal by virtue of an "offense under" sections 237(a)(2) or (3).

## III.  CONCLUSION

We therefore conclude that exhibiting or sponsoring an animal in an animal fighting venture in violation of 7 U.S.C. § 2156(a)(1) is a crime involving moral turpitude.  The respondent's conviction for this offense, which carried a potential sentence to a term of imprisonment for 1 year, renders him ineligible for cancellation of removal pursuant to section 240A(b)(1)(C) of the Act as an "offense under" section 237(a)(2)(A)(i), irrespective of both the general "admission" requirement in section 237(a) and the temporal (within 5 years of admission) requirement in section 237(a)(2)(A)(i)(I).  We therefore reaffirm our prior decision denying his application for cancellation of removal.  Accordingly, the respondent's appeal will be dismissed.

**ORDER:**  The appeal is dismissed.